COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present: Judges Petty, Alston and Russell
Argued at Lexington, Virginia


ASHLEY JENNIFER WHITE

v.       Record No. 1322-16-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE WILLIAM G. PETTY
SEPTEMBER 19, 2017

FROM THE CIRCUIT COURT OF PULASKI COUNTY
Bradley W. Finch, Judge

Kelsey M. Bulger, Assistant Public Defender (Cynthia Dodge,
Public Defender, on briefs), for appellant.

Victoria Johnson, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Ashley Jennifer White was convicted of two counts of child abuse and neglect in

violation of Code § 18.2-371.1(B) and one count of child abuse and neglect in violation of Code

§ 18.2-371.1(A).[1]  On appeal, White challenges only the conviction under Code § 18.2-371.1(A).

White argues that the evidence was insufficient to prove she committed a willful act or willful

omission that caused or permitted the tragic death of her five-year-old son.

BACKGROUND

When considering whether evidence is sufficient to sustain a criminal conviction, we

view the evidence in the light most favorable to the prevailing party at trial and grant to it all

reasonable inferences fairly deducible from that evidence.  Barrett v. Commonwealth, 268 Va.

---

[1] White was sentenced to serve five years for each conviction.  The trial court suspended
all but one year and eleven months of the fifteen-year sentence without apportioning the active
sentence among the three convictions.  It appears that at the time this case was argued, she had
already served the active portion of her sentence.

170, 179, 597 S.E.2d 104, 108 (2004).  It is "within the province of the [fact finder] to determine what inferences are to be drawn from proved facts, provided the inferences are reasonably related to those facts."  Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003).

On Sunday, March 22, 2015, White began her morning by leaving her infant daughter and five-year-old son at home alone while she took her husband to work.  When she returned, she took prescription Suboxone and laid down on her bed to watch television with her son while waiting for her daughter to wake up.  At about 8:45 a.m., White let her son go to the living room to watch cartoons, and she fell asleep.  White awoke at about 10:30 a.m. to the sound of her daughter's crying.  After tending to her daughter, White found the television in the living room blaring, the front door open, and her son missing.  White searched inside and outside for her son, but to no avail.  She called the landlord, who lived on adjoining property, and a neighbor to see if her son was there.  She walked to the wood line and fence line borders of her yard, calling for her son, but received no response.  She then called 911.

The law enforcement officers responding to the scene searched both inside and outside the home.  One officer saw the septic tank lid while he was using a search dog but did not investigate the lid at that time.  Later, he approached the septic tank lid and lightly kicked it, causing the lid to pop off the opening of the septic tank.  He picked up a four-foot metal rod laying nearby and handed it to another officer, who placed it into the brown murky water in the septic tank and moved it around, finding no resistance.  In the ensuing four days, the septic tank lid was lifted and replaced by several searchers, including an FBI agent, who had come to assist in finding the missing child.  After looking in the septic tank, neither the officer nor the FBI agent secured the lid on the opening.

During the four-day search for the child, White was interviewed multiple times. She initially told the officers that she had taken the children with her when she took her husband to work that morning, but later admitted that she had left them alone.[2] She said that if her son had gone outside, he would not have left the yard except to play with the nearby neighbors. On Thursday, March 26, the FBI agent ordered the septic tank to be drained, and at that time noticed that only one screw was in the lid's hole. A subsequent search of the surrounding area with a metal detector did not locate any other screws, bolts, or fasteners.[3] White's son's body was found in the bottom of the septic tank.

The septic tank had been installed by a contractor in approximately 2002. The septic system was inspected to ensure it conformed to all safety standards, including the requirement that it include a tamper proof, child resistant lid. Witnesses described the lid as a black plastic disc approximately two feet in diameter and weighing two to three pounds. White began renting the home in 2010, when her son was an infant. In 2014, the landlord, with the help of a retired plumber, ran a pipe from an adjacent rental property to the septic tank in White's yard. The connection required digging beside the tank and removing a plastic ring approximately a foot

---

[2] The fact that White left her young children alone at home while she took her husband to work was a significant fact in her convictions under Code § 18.2-371.1(B), which she does not challenge on appeal. Because no injury occurred to the children from being left alone earlier in the morning of March 22, 2015, the conduct does not establish criminal liability under Code § 18.2-371.1(A). However, White's changing story regarding leaving her children alone earlier on that fateful day are included here as relevant to the trial court's assessment of White's credibility.

[3] Photographs of the septic tank lid were admitted in lieu of the actual lid. The photographs show the label "safety screws →" on the lid and suggest the safety screws attached the lid from the side. These screws would have been obscured by grass that grew above the lip of the opening. Several of the screw holes on the top of the lid were caked with mud. No screws were attached to the lid when the photographs were taken, and no screws were admitted into evidence. No evidence was introduced as to what condition the screw or screws were in at the time of White's son's death.

down from the top of the septic tank.  While connecting the new line, the landlord removed toys

from the septic tank.[4]  The landlord mowed the yard often, including behind the home where the

_____

[4] The landlord testified that he had never pumped the tank and he did not remember removing toys from the tank.  The only testimony regarding toys in the septic tank came from White herself in an interview with Sergeant Billy Ritter after her son's body was discovered.  Ritter told White that he wanted as much information on the septic tank as possible.  Ritter testified at trial to the interview, reading from the transcript of the interview, but the transcript of the interview was not introduced as evidence.  Ritter testified as follows:

> [Commonwealth]:  Did Ms. White tell you that she was present at a time when the septic tank was cleaned or, or at least opened up?  And I'm referring to Page 36.  Well, did, did Ms. White say anything about a time when the lid was opened and I believe [the landlord] was present?
> [Ritter]:  Yes. We were actually discussing the history and their knowledge of the septic.  And she makes a statement that "[The landlord] and that guy were out back at one time digging stuff out of it, and they were bitching about finding toys."
>
> . . . .
>
> Her next statement after that was "Yeah, he told us to stop flushing cigarette butts."

Although the Commonwealth stopped there on direct examination, defense counsel elicited the next statements in the interview.

> [Ritter]:  Mrs. White states, "Yeah, he told us to stop flushing cigarette butts."
> [Defense]:  And then what did you ask her?
> [Ritter]:  "How did you do it?  How did you do that?  I mean, how did you put it in there? . . . There were toys that came [d]own the toilet?"
> [Defense]:  And how did she respond?
> [Ritter]:  "Yeah."

The context of the conversation indicated the complaint about toys was in 2014 when the landlord was adding the new line.  It is not completely clear from the testimony whether the toys were removed from the septic tank itself, from the filter, or from the hole dug beside the tank.  It was not clear from the testimony that the toys actually belonged to White's son.  Neither party elicited testimony to clarify these points.  Viewing the evidence in the light most favorable to the Commonwealth and with all reasonable inferences, we accept as fact that White was aware that the landlord removed her son's toys from the septic tank almost a year before his death.  There is

septic tank lid was. The landlord testified he "could mow up to it on top of it with a riding lawn mower [and would] run up to the edge of it, back off of it." The access lid for the septic tank was located about twelve feet from the back door of the residence, in the fenced backyard play area.

In an interview after her son's body was found, White admitted her son loved the outdoors and played by himself most of the time. She admitted that it would not be unusual for her son to go outside and to get something from the car while she was asleep. Her son played in the backyard so nobody else could see him. Toys were scattered in various places in the backyard. White recounted that a month or two before her son's death she saw her son stand on the septic tank lid. She "yelled" at him and told him he was not allowed on the lid; she made him promise never to stand on it again. When asked if the incident was a "red flag" to her, she responded, "I just thought he shouldn't be standing on it. . . . I didn't know it was that deep. I didn't know that it was like such a dangerous like (pause). I should've been—it should've been bolted. I didn't even know that. I mean, looking back at all the things that I should've done but I didn't."

After a two-day bench trial, the trial court found White guilty of child abuse and neglect in violation of Code § 18.2-371.1(A). The trial court noted that after hearing White's testimony and seeing her demeanor, it found some of her statements to be "self-serving testimony designed to help conceal her guilt." It found that White had lived in the home five years and was aware of the septic tank and its opening. Further, it found she was present in the past at a time when the septic tank was open and toys had been found in it and knew the backyard was a favorite place

---

simply nothing in this testimony, however, from which the trial court could infer that the toys got into the tank in a manner other than by flushing them down the toilet. Nor does this testimony provide a basis for inferring that White was aware that her son was able to open the lid or that she had been present when the tank was open.

for her son to play. The court concluded that White "was aware of the danger posed to [her son] by the septic tank" because she had made her son promise not to stand on the lid again and had told the police that in hindsight she should have taken additional precautions. White appeals the trial court's decision.

ANALYSIS

White attacks in two ways the sufficiency of the evidence to convict her. She argues that the evidence was insufficient to prove a willful act or willful omission, and she argues that the Commonwealth failed to prove that her conduct caused or permitted the death of her child.

"When considering on appeal the sufficiency of the evidence presented below, we 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence to support it.'" Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002)). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Although the trier of fact may "draw reasonable inferences from basic facts to ultimate facts," id., it must not adopt a conclusion reached by the "process of assuming a first position, and then piling inference upon inference," Payne v. Graves, 32 Va. (5 Leigh) 561, 572 (1834) (quoted with approval in Carter v. Commonwealth, No. 161102, 2017 Va. Unpub. LEXIS 21 (Va. Aug. 17, 2017)).

Code § 18.2-371.1(A) provides, in part, "Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or willful omission . . . causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony."

> The word [willful] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when

- 6 -

used in a criminal statute it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely[.] The word is also employed to characterize a thing done without ground for believing it is lawful.

Barrett, 268 Va. at 183, 597 S.E.2d at 111 (alterations in original) (quoting United States v. Murdock, 290 U.S. 389, 394 (1993)); Willful, Black's Law Dictionary (10th ed. 2014) ("The term *willful* is stronger than *voluntary* or *intentional*; it is traditionally the equivalent of *malicious, evil* or *corrupt*."). "The term 'willful act' imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury." Barrett, 268 Va. at 183, 597 S.E.2d at 111. The terms "bad purpose" or "without justifiable excuse" necessarily imply knowledge that particular conduct will likely result in injury or illegality. Id.; Flowers v. Commonwealth, 49 Va. App. 241, 248, 639 S.E.2d 313, 316 (2007) ("In other words, the defendant must have been aware that [the] [omission] was likely to result in serious injury." (quoting Mangano v. Commonwealth, 44 Va. App. 210, 214, 604 S.E.2d 118, 120 (2004) (first alteration in original))). "[S]omething more than negligence must be proved beyond a reasonable doubt to support [a] conviction [under Code § 18.2-371.1(A)]." Ellis v. Commonwealth, 29 Va. App. 548, 555, 513 S.E.2d 453, 457 (1999).

When evaluating whether lack of supervision was a willful omission that caused or permitted a substantial injury to a child, this Court often considers the analysis in Ellis and Barrett. In Ellis, this Court reversed convictions of felony child neglect under Code § 18.2-371.1(A). The defendant in Ellis left her children, ages two years and four years, unsupervised and asleep in her home while she visited in another building with a neighbor. Id. at 552, 513 S.E.2d at 455. The defendant had negligently left the gas stove on, resulting in a fire that injured the children; the smoke detector was inoperable. Id. at 553, 513 S.E.2d at 455. This Court recognized that the analysis "which is relevant to our determination of 'bad purpose' does

not relate simply to why [the defendant] left the [children unsupervised.]  Rather, it relates to the degree to which she was aware of the danger when leaving her children unattended."  Id. at 555, 513 S.E.2d at 457.

The Supreme Court cited Ellis with approval in Barrett, but distinguished Barrett's level of awareness regarding the probability of injury when she left her children unsupervised. Barrett, 268 Va. at 186 n.8, 597 S.E.2d at 112 n.8.  Barrett fell into a heavy sleep after a night of drinking and left her children, ages ten months and two years, unsupervised and unsecured for more than six hours.  Id. at 182, 597 S.E.2d at 110.  The mother knew that the older child's favorite place to play was the bathtub and knew of the older child's "propensity for attempting to injure [the younger child,] but recklessly disregarded those warning symptoms."  Id. at 184, 597 S.E.2d at 111.  By leaving the two young children unsupervised for the extended length of time, and with the knowledge that the two year old had tried to kill the infant on prior occasions, the defendant "created a situation 'reasonably calculated to produce injury, or which [made] it not improbable that injury [would] be occasioned . . . ."  Id. (first and second alteration in original).

"The distinguishing feature between Barrett and Ellis is an awareness of the likely danger in the defendant's conduct.  Barrett knew of the danger; Ellis did not."  Mangano, 44 Va. App. at 215, 604 S.E.2d at 120.  Code § 18.2-371.1(A) "punishes willful omissions, which requires an awareness that the conduct would cause or permit serious injury.  It proscribes advertence, not inadvertence."  Id. at 216, 604 S.E.2d at 121.  Thus, a finding of willfulness requires that the parent "must have been advertent to the likelihood that the conduct [omission] in question would cause or permit serious injury."  Id. at 215, 604 S.E.2d at 121 (quoting Roger D. Groot, Criminal Offenses and Defenses in Virginia 355 (4th ed. 2003)); see also Bean-Brewer v. Commonwealth, 49 Va. App. 3, 11, 635 S.E.2d 680, 684 (2006) (noting analysis under the Supreme Court's definition of "willful" in Barrett requires "an examination not only of the act

that created the risk, but also of the degree to which the accused 'was aware of the danger' that resulted from the act" (alteration omitted)).

The Supreme Court subsequently distinguished the conduct in Morris v. Commonwealth, 272 Va. 732, 740, 636 S.E.2d 436, 440 (2006), from that in Barrett. In Morris, a mother fell into a deep sleep while taking a nap with her two children, ages five years and two years. Id. at 734, 636 S.E.2d at 437. While the mother was asleep, the two children unlocked the door and wandered outside unsupervised. The mother failed to wake up, even when the police banged loudly on her door and loudly announced themselves. The Supreme Court reversed Morris's conviction under Code § 18.2-371.1(B), holding the evidence was insufficient to show Morris acted willfully with a reckless disregard for the lives of her children. Id. at 740, 636 S.E.2d at 440. Although Morris admitted she had a substance abuse problem, the court concluded it was "mere speculation . . . to say that Morris' deep sleep was likely drug or alcohol induced." Id. Although Morris admitted that the children had gotten out of the residence "a few days prior," the Supreme Court found she "had no reason to believe her children would be in any danger while she was asleep with them, particularly after she had double-locked the trailer door." Id. at 736, 636 S.E.2d at 438.

We also find this Court's analysis in Mangano to be instructive. The father in Mangano discovered that his fourteen-year-old son and his friend were in the living room and the son had retrieved a rifle. Mangano, 44 Va. App. at 215, 604 S.E.2d at 120. The father told his son to put the rifle away in an upstairs bedroom. The father "had no reason to suspect that the gun was loaded or that his son would not obey him." Id. The son, however, did not immediately put the rifle away and accidentally shot his friend, causing serious injury. Id. The trial court convicted the father under Code 18.2-371.1(A), opining, "I just can't understand how a person can be in a

- 9 -

room and see a gun in the presence of two children and not take some positive act to make that room safe." Id. at 216, 604 S.E.2d at 121. This Court reversed the conviction, concluding,

> That interpretation imposed a criminal sanction for failing to act to insure the room was safe. The statute punishes willful omissions, which requires an awareness that the conduct would cause or permit serious injury. It proscribes advertence, not inadvertence. The evidence did not establish that the defendant knew danger ensued from only ordering his son to put the gun away rather than taking it from him. It failed to establish "knowledge and consciousness that injury will result from the act done." Barrett, 268 Va. at 183, 597 S.E.2d at 111.

Id.

Here, White took a nap, leaving her five-year-old son unsupervised in the home.[5] At some point, her son left the home without White's knowledge and fell into the septic tank, which had an unsecured lid. To convict White under Code § 18.2-371.1(A), the Commonwealth was required to show that White left her son unsupervised with "reckless disregard" for his safety and with the "knowledge and consciousness" that the lack of supervision would "likely result in injury." See id.

The evidence in the light most favorable to the Commonwealth showed that the son loved the outdoors and had gone outside on prior occasions without White's knowledge. White's son was capable of unlocking the door and the screen door. His favorite place to play was in the backyard, with a basketball hoop on a concrete porch, which was about ten feet from the septic tank lid. The trial court did not err in inferring that White knew her son might go outside to play

---

[5] The trial court found that White had taken a prescription drug before her nap, which may have made her drowsy. However, there was no evidence that the prescription rendered her inaccessible to her son, as was the defendant in Barrett. See Barrett, 268 Va. at 182, 597 S.E.2d at 110. Even if White had been sleeping heavily, that is not sufficient in itself to render the lack of supervision a willful omission. See Morris, 272 Va. at 740, 636 S.E.2d at 440. Our analysis would be essentially the same if White had allowed her son to play in the backyard unsupervised for a different reason, such as talking on a phone, cooking dinner, or visiting a neighbor as in Ellis.

- 10 -

without her knowledge while she was sleeping. However, the mere presence of potential hazards in the yard, such as a swimming pool, pond, or septic tank, is not sufficient to find that White was advertent to the likelihood that lack of supervision would result in serious injury. The Commonwealth was also required to show that White knew of a heightened risk in the yard such that the son would likely be injured if he played there unsupervised. This appeal turns on "the degree to which [White] was aware of the danger [of the unsecured septic tank] when leaving her [son] unattended." See Mangano 44 Va. App. at 215, 604 S.E.2d at 120.

The trial court was entitled to disbelieve or disregard White's testimony that she had never tried to open the septic tank lid and did not realize the lid was a dangerous hazard. The Commonwealth failed, however, to present evidence from which the trial court could infer White *did* know. The Commonwealth established through the landlord's testimony that he had often cleaned the filter on the septic tank, had done construction on the tank, and had mowed the grass around the tank. White clearly knew there was a septic tank in her backyard and knew that the landlord had performed maintenance on the tank. Neither party, however, elicited testimony regarding how many screws were required to secure the lid, the last time it was known to be secured, or whether White had ever seen the lid unsecured. No evidence was admitted as to whether the lid was child resistant or whether missing screws would be noticeable to a casual observer. No evidence established that White had been present in the backyard when the tank was open or that her son had dropped toys into the tank by way of the lid. Simply put, there was no evidence from which the trial court could infer that White was aware, prior to her son's death, of the heightened danger posed by the unsecured lid. See Mangano, 44 Va. App. at 215, 604 S.E.2d at 120.

Nevertheless, the Commonwealth emphasizes the trial court's finding that there were toys in and around the septic tank. The Commonwealth suggests that, accordingly, White should

have known that her son had a propensity for playing in or near the septic tank opening. The trial court was entitled to disregard the landlord's testimony that he did not remember any toys in the filter[6] or floating in the septic tank. Even if the trial court concluded that White's son's toys had been found in the septic tank almost a year prior to his death, no evidence was presented to support the theory that White's son had exhibited a propensity for dropping toys into the tank in the months prior to his death. To the contrary, the sanitation contractor who pumped the tank to discover the body testified there were no toys, balls, or similar objects visible. The only toy present in the tank and entered into evidence was an action figure in the bag with the body. Thus, there was simply no evidence from which the trial court could infer that White knew her son had a propensity for opening the unsecured lid and dropping toys into the tank while playing in his backyard.

The Commonwealth stressed in its argument before the trial court and this Court that White recognized the danger of the septic tank when she saw her son standing on the lid. One to two months prior to her son's death, White saw him standing on the lid of the septic tank. White's statements during interviews and trial were consistent; she "yelled" at her son to get off the lid and made him promise not to stand on the lid again. This incident, however, also showed White did not disregard the potential hazard of the septic tank, but rather took steps to mitigate the danger by instructing her child not to stand on the lid again. Moreover, here, as in Mangano, White had no reason to suspect that her son would not obey her. See Mangano, 44 Va. App. at 215, 604 S.E.2d at 120. Although White's son played frequently in the backyard, no evidence suggested White knew of subsequent occasions when her son played on or near the lid, or engaged in dangerous activity in the yard, prior to the tragic events of March 22, 2015.

---

[6] The landlord described the filter as a plastic object about two inches in diameter that fits down a three-inch piece of pipe that extends above ground near the septic tank lid.

Moreover, there was no evidence suggesting that the screws to the lid were unsecured when White told her son to get off the lid. Nothing in White's statements suggested that the lid was loose or dislodged in any way when her son was standing on it. Thus, White's instruction to her son reflected "the degree to which [White] was aware of the danger" the septic tank posed at that time. See id.[7]

Code § 18.2-371.1(A) does not impose criminal liability on parents who fail to take positive action to ferret out every potential hazard to ensure the premises are safe. See id. at 216, 604 S.E.2d at 121. Rather, the statute punishes a parent's willful omission, "which requires an awareness" of the danger associated with leaving her child unsupervised. Compare Barrett, 268 Va. at 184, 597 S.E.2d at 111 (aware of the particular danger), with Ellis, 29 Va. App. at 555, 513 S.E.2d at 457 (unaware of the particular danger). Here, the evidence was insufficient to establish that White acted with a "reckless disregard" for her son's safety and with the "knowledge and consciousness" that this lack of supervision would "likely result in injury."

---

[7] We agree with the dissent that the septic tank posed a significant danger to a five-year-old child. However, as we noted above, this appeal does not turn on that fact. Rather, it turns on whether White was aware of that significant danger and, by willful act or willful omission, failed to prevent the death of her child. The dissent states there was "considerable" testimony that the lid, "on occasion" was not securely attached and the "evidence presented supports the reasonable conclusion that the vulnerable state of the septic tank lid was apparent." The dissent fails to address the penultimate question; apparent to whom? While the evidence supports the conclusion that the lid was not properly attached, there is no evidence to suggest that it was or should have been apparent to her that the lid was not secured. To the contrary, the landlord testified that he mowed the grass right up to the lid, but he did not give any indication that he saw that it was not properly attached. Photographs of the tank opening and the lid do not support the inference White knew the lid was unsecured. See supra footnote 3. Thus, we see no way to infer from the evidence presented that it would be "apparent" to White that the lid was unsecured.

While we agree with the dissent that the trial court was entitled to draw reasonable inferences from the evidence presented, those "[i]nferences must be based on facts and not upon other inferences or mere speculation." Watson, Adm'x v. Virginia Elec., Etc. Co, 199 Va. 570, 578, 100 S.E.2d 774, 780 (1957).

CONCLUSION

Over a century ago, Supreme Court Justice Harlan observed that "it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law." United States v. Clark, 96 U.S. 37, 49 (1878) (Harlan, J., dissenting). The tragic death of a young child is a hard case. When the child's body is found in a septic tank after four days of searching, the case is even harder. But it would not benefit the general good of the community to expand Code § 18.2-371.1's requirement of "willful" conduct to include a parent's failure to protect a child from an undiscovered and unknown danger. Septic tanks are common in many areas of this Commonwealth. As tragic as the facts of this case are, to affirm this conviction would be to hold that Code § 18.2-371.1 requires a parent to search out potential dangers and continuously supervise his or her child. A parent could be subject to a felony conviction if he or she failed to recognize the danger posed by the unsecured tank cover, the unlatched gate, the rotted board, the unfenced pond, or any other hazard that, in hindsight, could have been corrected. Simply put, we conclude that the General Assembly, by requiring proof of a *willful* act or omission, intended a much higher *mens rea* than the evidence establishes in this case. Here, the evidence was insufficient to show that White left her son unsupervised with "the knowledge and consciousness that injury would result." See Barrett, 268 Va. at 183, 597 S.E.2d at 111. Accordingly, we reverse White's conviction and dismiss the indictment.[8] We remand to

---

[8] Because we find the evidence was insufficient to support the element of a willful act or willful omission, we need not address specifically whether the evidence was sufficient to show that White's failure to supervise caused or permitted her son's death.

the trial court for entry of a final sentencing order reflecting our reversal of White's conviction under Code § 18.2-371.1(A).[9]

<u>Reversed and remanded with instructions.</u>

---

[9] The trial court sentenced White to five years' imprisonment on each of the three convictions. It then suspended thirteen years and one month of the total fifteen-year sentence. Because the term of suspension exceeds the maximum five-year punishment for each of the remaining convictions, the order must be corrected to reflect a term of suspension that does not exceed ten years, less the active sentence previously imposed.

Alston, J., dissenting.

The eloquence and care of the majority opinion to reach a difficult result in a heartbreaking case speaks to the best work of the jurisprudence of this Court. While a court should always endeavor not to allow hard cases to make bad law; it can also be said with at least as much truth, that hard cases can and do endeavor to accomplish the objective of the legislature to make *good* law. True justice is not measured by what we think we would do in a similar situation; it is measured by the law and how the law applies to certain facts.

The willful omissions of appellant in this case resulted in tragic circumstances that the trial court took great pains to resolve under the reasonable doubt standard. For this reason, and based upon this Court's applicable standard of review on appeal, I respectfully dissent from the thoughtful analysis of my colleagues in the majority.

The majority suggests that to find appellant guilty, we need to adopt something in the nature of a strict liability obligation for parents who live on properties with septic systems, a swimming pool, a pond, or other conditions otherwise benign, but potentially hazardous. I disagree. The compelling facts *of this particular case* provide the backdrop to the criminally culpable event under this statute.

In a case such as this, we must view the evidence in light of "all the circumstances preceding and surrounding" the incident. Barrett v. Commonwealth, 268 Va. 170, 184, 597 S.E.2d 104, 111 (2004). In doing so, we review the relevant factors including the gravity and character of the possible risks of harm, the accessibility of the parent, the length of time of the abandonment, any *protective measures taken* by the parent, and the age and maturity of the child. Miller v. Commonwealth, 64 Va. App. 527, 544, 769 S.E.2d 706, 714 (2015) (citing Barnes v. Commonwealth, 47 Va. App. 105, 113, 622 S.E.2d 278, 282 (2005)). These dangers inherent in a situation can be inferred by the fact finder as a matter of common knowledge. Commonwealth

- 16 -

v. Duncan, 267 Va. 377, 386, 593 S.E.2d 210, 215 (2004).  Significantly in this case "when the sufficiency of the evidence is challenged on appeal, we review the evidence in the light most favorable to the Commonwealth granting to it all reasonable inferences fairly deducible therefrom."  Kelly v. Commonwealth, 41 Va. App. 250, 254, 584 S.E.2d 444, 447 (2003) (*en banc*).

When so viewed, the circumstances show beyond a reasonable doubt that appellant was guilty of more than "ordinary negligence."  Here, appellant was fully aware that her five-year-old son, N.T., could unlock the broken screen door to their home and that he routinely left the house unsupervised while she slept.  Even further, the record indicates that appellant *knew* of the potential danger that the septic tank posed to N.T.  The septic tank was approximately ten to twelve feet from the rear of the home.  N.T.'s toys were scattered throughout the backyard, and there were toys found in *and* around the septic tank on at least one prior occasion.  Appellant was either present during or after the tank was cleaned, and was made aware that N.T.'s toys were found inside the septic system.  While the evidence may be subject to interpretation as to how the toys actually got into the septic system, it is clear that some of N.T.'s toys were indeed observed around the septic system and that appellant *knew* that N.T. was interested in the septic tank and the area surrounding it.  Appellant had previously seen N.T. standing on the lid, and went so far as to tell N.T. that he was not allowed to climb on it.  Appellant even made the five-year-old N.T. promise never to climb on the lid of the septic tank again.

My respectful disagreement over the interpretation and significance of the facts of this case underscores my view that the standard of review dictates the result I suggest we should reach.  Much of the evidence adduced at trial was subject to interpretation, but indeed there was considerable testimony that on occasion the lid was not properly attached to the septic tank, and apparently not secure.  The evidence presented supports the reasonable conclusion that the

- 17 -

vulnerable state of the septic tank lid was apparent, such that even the slightest kick could remove it. Coupling these facts with the evidence of appellant's conduct prior to, and after, N.T.'s disappearance, appellant's willful omissions created a situation which caused or permitted serious injury (here, death) to N.T. In my view, these facts alone, and *not* the failure of appellant to take positive action to ferret out *every* potential hazard to ensure the premises were safe, support the result reached by the trial court. It was appellant's utter failure to take any credible corrective action to address this known danger of the septic tank, which creates the liability. Appellant simply does not discharge her responsibility and duty under the statute by resting her claim on an inferential hardship which may be placed on blameless parents or caretakers.

Willful omissions carry the same level of criminal culpability as intentional acts under the applicable statute. Many of the facts in this case led me to believe that a reasonable fact-finder could find appellant guilty under this statute, including (1) the known dangerousness (and apparently unaddressed) condition of the defective covering of the septic system forewarning a particularized risk to the child; (2) the prior admonitions to appellant, direct and otherwise, of the child's attraction to *and* exposure to the area in which the unsafe system functioned; (3) the either casual indifference to or callous disregard to the circumstances appurtenant to the dangerousness of this particular threat to the child; (4) the observance of marijuana in the residence and the trial court's particularized finding that appellant consumed the prescriptive somnolent Suboxone on the date of the incident; and finally (5) appellant's lack of candor in the events leading up to, and during the period of, the investigation of the child's death.

I reference all of these critical facts because while I believe that not one of these facts standing alone would support a conviction under this statute, willful omissions are traditionally and necessarily supported by circumstantial evidence and inferences. And circumstantial evidence, by its very nature, envisions a totality of the circumstances analysis. See Juniper v.

Commonwealth, 271 Va. 362, 416, 626 S.E.2d 383, 418 (2006) (stating "while no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion'" (quoting Chichester v. Commonwealth, 248 Va. 311, 329, 448 S.E.2d 638, 650 (1994), cert. denied, 513 U.S. 1166 (1995))).  It was reasonable for the trial court to conclude that the totality of appellant's actions and omissions ultimately led to N.T.'s death; which is all that the Commonwealth was required to prove.  All of the facts considered together under the totality of the circumstances present in this case, support appellant's conviction.  Accordingly, and with all due regard for the exceptional consideration and text of the majority, I would affirm the judgment of the trial court.