COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges AtLee, Causey and Callins
Argued by videoconference


HANK LARKIN SMITH, JR.
                                              MEMORANDUM OPINION* BY
v.       Record No. 0346-22-1                 JUDGE RICHARD Y. ATLEE, JR.
                                                    AUGUST 15, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Jerrauld C. Jones, Judge

Kristin Paulding (7 Cities Law, on brief), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Hank Larkin Smith, Jr., for felony homicide

in violation of Code § 18.2-33, child abuse or neglect causing or permitting serious injury to the life

or health of a child in violation of Code § 18.2-371.1(A), child neglect in violation of Code

§ 18.2-371.1(B), and child cruelty in violation of Code § 40.1-103.[1]  Smith argues that the trial court

erred in rejecting his proposed jury instruction on the definition of the term "willful."  He also

challenges the sufficiency of the evidence to establish multiple elements of the charged offenses.

Finding no error, we affirm the trial court's judgment.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The trial court entered two sentencing orders.  In the first, the trial court sentenced
Smith to thirty years of imprisonment for felony murder, with nine years of that sentence
suspended.  In the second, the trial court sentenced Smith to five years of imprisonment for each
conviction under Code § 18.2-371.1 and one year of imprisonment for child cruelty.  The trial
court suspended all of Smith's sentences on these convictions.  We note, however, that the
sentencing summary in the second sentencing order incorrectly states that his sentences for the
offenses total thirty years of imprisonment with nine years suspended.  We remand the matter to
the trial court for the sole purposes of correcting this scrivener's error.  *See* Code§ 8.01-428(B).

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). In doing so, we discard any of Smith's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

### A. *L.C.'s death*

L.C. was Smith's four-year-old son. L.C. lived in a house in Norfolk with his three-year-old brother, T.C.; Smith; Smith's girlfriend, Catherine Seals; Seals's fourteen-year-old son, Robbie[2]; and Smith's and Seals's infant daughter.

On the evening of November 12, 2018, paramedics responded to a 911 call for help involving an unresponsive child. When they arrived, they found L.C. on the living room couch. Robbie was present, but there were no adults in the home. L.C. was wearing a shirt and a diaper, and he was covered in a blanket up to his chest. He was not breathing and had no pulse, and there were bruises "throughout his entire body." Paramedics took L.C. to the Children's Hospital of the King's Daughters, but he did not regain consciousness and was pronounced dead that night.

### B. *Events preceding L.C.'s death*

In February 2018, the Harrisonburg Department of Social Services removed L.C. and T.C. from their mother because of unsafe living conditions and substance abuse. They were

---

[2] Although we normally refer to juveniles by their initials, we do not do so here as Robbie was convicted of voluntary manslaughter in the Circuit Court of the City of Norfolk and that proceeding is a matter of public record.

initially placed in foster care, while Smith started supervised monthly visits with them. In July 2018, T.C. and L.C. were placed with Smith on a trial basis at his Norfolk home.

Smith was the sole provider for his family, and his job required him to be out of town for two to three weeks at a time. While Smith was away, Seals was the sole caretaker for all the children. L.C. and T.C. were not toilet trained, had speech development issues, and were often aggressive with each other. Robbie helped Seals care for L.C. and T.C. by cooking, getting them from the bus, helping with homework, and other things. Seals noticed bruises and bite marks on L.C. and T.C. in September 2018. L.C. complained that Robbie was hurting him. Both she and Smith told Robbie to stop disciplining L.C. and T.C. Seals reported things to Smith when he was away.

Regina Giroux lived near Smith, and she met T.C. and L.C. in August 2018 when Robbie was taking them to the playground. Giroux noticed the boys were crying. She had seen "big, huge knots all over" L.C.'s head. On the way back from the park, L.C. and T.C. looked scared, L.C.'s clothes were rumpled, and T.C.'s hands were shaking. Robbie, as a friend of her grandson, visited her home constantly. Giroux described Robbie as "sneaky" and "mean" and saw him being rough with other boys. She reported to Norfolk Child Protective Services ("CPS") that L.C. and T.C. feared Robbie and that Seals was "hateful" and yelled at them "constantly." An investigator with CPS investigated the complaint. She noted that both boys had injuries that did not appear to be related to any abuse.

Smith regularly drove L.C. and T.C. to Harrisonburg for monthly supervised visits with their mother. On one visit, the Family Educational Services worker noted that the boys had bruises and were very hungry. She took photos of the "hand marks around their necks" and contacted Child Protective Services in Harrisonburg about her observations. At the end of the

visit, Smith told the worker that L.C. and T.C. had strangled each other while he had stepped outside for a cigarette.

## C. *The investigation*

Detective Matthew Nordan of the Norfolk City Police Department investigated L.C.'s death. He observed L.C.'s body at the hospital, and he noted the "numerous" bruises on his body. He then went back to L.C.'s house, where he spoke with Smith and Robbie.

In a recorded statement, Smith explained that the previous Friday night, November 9, 2018, L.C. had been vomiting and had diarrhea. Smith gave the child Pepto-Bismol. L.C. was vomiting so much[3] that Smith had to change the trash bags multiple times, and eventually, he and Seals put L.C. in the bathtub to keep him clean. He explained that by Saturday, L.C.'s condition seemed to be improving. He would "get up sometimes on his own, but sometimes he would need a little assistance." Smith told police that he just "thought [L.C.'s] body was sore from throwing up." By Sunday, L.C. was vomiting less, keeping food down, moving around, and playing. L.C. seemed fine on Monday. Smith and Seals did not seek medical treatment as they felt L.C. was getting better.[4]

At around 6:00 p.m. on Monday, the day L.C. died, Smith and Seals left L.C. and T.C. in Robbie's care while they drove Seals's other daughter home to her father. Smith told police that while they were gone, Robbie called Seals and told her that he had fed L.C. some chicken and sent him to bed, but that L.C. was then unresponsive. Seals called 911. When Seals and Smith arrived home, and L.C. was in the ambulance, Seals noticed that L.C. had new bruises on his body. But Smith did not mention any of the bruising in his initial statement to police.

---

[3] During a later interview, Smith admitted that L.C. was vomiting blood.

[4] Seals confirmed that while L.C. was vomiting, Smith mentioned taking him to the hospital. But Seals suggested they wait to see if he improved with Pepto-Bismol and ginger ale, so Smith went to get these items.

The following day, Detective Nordan attended L.C.'s autopsy, which was conducted by Dr. Wendy Gunther. Dr. Gunther determined that L.C. died from blunt force trauma to his abdomen. Based on reports that L.C. had experienced abdominal pain, nausea, and vomiting beginning on Friday, November 9, 2018, and continuing through the weekend, Dr. Gunther concluded that L.C. was injured that Friday night, with the fatal blows being delivered just before his death on Monday. She opined that L.C.'s death would have occurred within minutes of the infliction of the fresh hemorrhage, and stated that the child had "a belly full of blood." She noted that the child's "duodenum ha[d] been injured before at least once, maybe several times, and it ha[d] finally given up the ghost." There was also a mass of scar tissue containing lymph nodes where his aorta branched "from previous injury." "[T]his is a deep punching, stomping, or kneeling injury in his belly that has injured the tissue around his aorta so badly that it's created a little mass of scar tissue, lymph nodes, and iron."

Dr. Gunther also noted that L.C.'s body was covered with 80 to 100 bruises, some of which were in groups, suggesting they were grip marks or knuckle marks. There were patterned injuries on the child's back suggesting he had been hit with a belt and sustained repeated injuries. Dr. Gunther stated:

> This child has been hurt over and over and over again at least days ago, but I don't know if it was weeks ago or months ago. It was at least long enough for them to start turning his blood into iron and to make some scar tissue, and then he had been hurt again just before he died.

In her opinion, "a great many" of the bruises were not consistent with accidental injuries. While she could not precisely date any of the bruises, she did note that some bruises were "completely fresh" and "some were beginning to show changes and starting to heal." Dr. Gunther also observed that L.C.'s weight was so low it was "off the growth chart."

On November 17, 2018, following the autopsy, Detective Nordan spoke with Smith. During that conversation, Smith admitted he saw the bruises on L.C.'s body the previous Friday. He said that he asked Seals about the bruises, but she did not know where they came from. Smith explained that he was often away from home, but he knew "how [L.C.] was acting toward Robbie." He knew Robbie played "rough" with the younger boys, and he thought that "Robbie might have actually did something." Smith also stated that on occasion he found L.C. crying in Robbie's presence, and L.C. would not explain why. Smith told Robbie to "[s]top doing stuff." Smith told the detective that L.C. had told him that Robbie hit him and Robbie denied it. Smith saw Robbie "pop" L.C. on the head and told Robbie not to do this. Smith also admitted that L.C. and T.C. were "skittish" around Robbie and would refuse to go to the park with him.

Smith also told Detective Nordan about a choking incident that had occurred in September 2018. Robbie was watching the boys, and when Smith and Seals returned home, they found L.C. and T.C. injured. Robbie told them that the boys had choked each other. They took the boys to the hospital, but they did not report that the boys were left at home alone with Robbie for fear of a report to CPS or an allegation that Robbie was responsible for the injuries. Smith admitted that he was told at the hospital that "the kid is being abused." Smith stated that he thought T.C. or L.C. could have choked each other, but he did not think that Robbie would do that. Nevertheless, after this incident, Smith claimed that he and Seals stopped going places together to make sure an adult was present with Robbie and the younger boys.

During his investigations, Detective Nordan also looked into the strangulation incident. The boys had traumatic petechiae on their faces. Because of this type of injury, the registered nurse who examined the boys was concerned that someone else had choked the boys, as it did not seem plausible to her that T.C. and L.C. had caused those injuries to each other. A different nurse disagreed, feeling that the injuries were consistent with what Smith told them. The treating

- 6 -

physician allowed the children to leave with Smith and did not report the incident to CPS, as Smith and the children already had an appointment with their social worker the next day.

In January 2019, Detective Nordan spoke with Robbie. Robbie admitted that he struck L.C. in the stomach with a folding chair on Friday, November 9, 2018. On the day L.C. died, Robbie struck L.C. in the stomach while pinning him down with a knee. Robbie also admitted that it was him that choked L.C. and T.C. in the September 2018 choking incident. He also told Detective Nordan that Smith knew that Robbie was the one that strangled the boys. Robbie was taken into custody.

Smith was interviewed for a final time on January 24, 2019. Smith told the detectives that he had encouraged Robbie to come forward. He described Robbie as a "mama's boy," and noted that when he was away from home for work, Seals did not tell him about the bruises on L.C. When he noticed them on L.C. in the bathtub, he asked Seals about it. The bruises seemed "pretty new." Robbie had issues with both L.C. and T.C. at times. He described how Robbie would "ease his way in" and try to act like a parent, but Smith and Seals told him to leave the parenting to them. He described how L.C. would cry and say Robbie hit him, and Robbie would deny it. When Smith did not see any marks on L.C., he thought they were just false accusations. He would tell Robbie to leave the kids alone. But Seals told him that Robbie continued this behavior once Smith left for work. Even so, he did not think Robbie would do "anything," and he told police that he had trusted Robbie. Smith also admitted that he had lied about being home at the time of the September 2018 choking incident.

On Smith's cell phone, the police found seven photos showing bruises on L.C. and T.C. The photos were taken on August 3, 2018. In a jail phone call on January 6, 2020, Smith told his aunt that he had the photos to "cover [his] ass."

D. *The charges*

On March 4, 2020, a grand jury indicted Smith for felony homicide and child abuse or neglect causing or permitting serious injury to L.C. between November 9 and 12, 2018. The grand jury also indicted Smith for child abuse or neglect between August 1 and November 8, 2018, and for child cruelty between August 1 and November 12, 2018.

E. *The trial*

At trial, Detective Nordan testified, and the Commonwealth played Smith's statements to the police for the jury. The social workers assigned to T.C. and L.C. also testified. Seals also testified, claiming that it was Smith who made the decision to lie about the strangulation incident so that Robbie would not get in trouble. She described Smith and Robbie as friends, who were sometimes secretive and kept things from her.

Dr. Michelle Clayton, the medical director of the child advocacy center at the Children's Hospital of the King's Daughters, attended L.C.'s autopsy and testified as an expert in pediatric child abuse. She noted the extensive bruising. Given the sudden and severe nature of L.C.'s symptoms on November 9, 2018, a "prudent caregiver should have sought medical attention for him." Dr. Clayton also opined that L.C. "had a very high likelihood of surviving if he had not had additional trauma inflicted upon him." Dr. Clayton stated that bruises on a child's chest and abdomen, such as on L.C.'s body, were "unusual" to result from "accidental trauma" due to reflexive tendencies humans have to protect those areas of the body. Based upon the shapes and number of the bruises, Dr. Clayton concluded that L.C. was "subjected to repetitive blunt-force trauma to his chest and to his abdomen, which caused internal organ injury as well as external bruises." She also noted that L.C. weighed 28 pounds at the time of his death and was in the "zero percentile" for growth for a child his age. He had lost eight pounds since the September 2018

choking incident. Dr. Clayton stated that such unexplained weight loss in a young child produces "a high concern for neglect, nutritional neglect, a deprivation of food."

After the close of the Commonwealth's case, Smith moved to strike the evidence. He argued that the evidence was insufficient to meet the "willful" element of the child abuse and neglect charges. He also argued that his actions did not "cause or permit" L.C.'s death under Code § 18.2-371.1, nor did he "cause" L.C.'s death within the meaning of Code § 18.2-33. Finally, he argued that the Commonwealth had not proven that he acted with criminal negligence as required by the child endangerment statute. The trial court denied the motion. Smith did not present any evidence on his behalf, and he renewed his motion to strike. The trial court again denied the motion.

At the conclusion of the evidence, the parties discussed the jury instructions with the trial court. The parties agreed to use the Virginia Model Jury Instruction defining "willful." That instruction provides,

> A willful act is one done with a bad purpose, or without justifiable excuse, or without ground for believing it is lawful. A willful act is intentional, or knowing, or voluntary, as distinguished from accidental. The terms "bad purpose" or "without justifiable excuse," require knowledge that the particular conduct will likely result in injury or illegality.

Smith also proffered an additional proposed instruction regarding the meaning of "willful." His proposed instruction was as follows: "The term willful is stronger than voluntary or intentional; it is traditionally the equivalent of malicious, evil or corrupt." This proposed instruction used a *Black's Law Dictionary* definition of willful taken from *White v. Commonwealth*, 68 Va. App. 111, 119 (2017). The trial court refused the instruction, noting that the model jury instruction was sufficient.

The jury found Smith guilty on all charges. Smith now appeals.

## II. ANALYSIS

A. *The trial court did not abuse its discretion by denying Smith's proposed jury instruction.*

Smith argues that the trial court erred in denying his proposed jury instruction on the meaning of the term "willful." On appeal, this Court's "sole responsibility in reviewing [jury instructions] is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Molina v. Commonwealth*, 272 Va. 666, 671 (2006) (alteration in original) (quoting *Swisher v. Swisher*, 223 Va. 499, 503 (1982)). "When granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle." *Gaines v. Commonwealth*, 39 Va. App. 562, 568 (2003) (en banc) (quoting *Stockton v. Commonwealth*, 227 Va. 124, 145 (1984)).

At trial, the trial court gave the Virginia Criminal Model Jury Instruction for the term "willful." Smith did not object to the granted instruction, but he proposed an additional instruction. His proposed instruction was based upon a quotation from *Black's Law Dictionary* contained in this Court's opinion in *White*, 68 Va. App. at 119.

Our Supreme Court has said that "statements appearing in opinions of th[e] court, while authority for the propositions set forth, are not necessarily proper language for jury instructions." *Snyder v. Commonwealth*, 220 Va. 792, 797 (1980) (quoting *Oak Knolls Realty v. Thomas*, 212 Va. 396, 397 (1971)). "Virginia courts have often cautioned against lifting the 'language of a specific opinion' for a jury instruction given that an appellate opinion 'is meant to provide a rationale for a decision—and may not translate immutably into jury instructions.'" *Mason v. Commonwealth*, 49 Va. App. 39, 49 (2006) (quoting *Seaton v. Commonwealth*, 42 Va. App. 739, 753 (2004)).

The model instruction the trial court granted was an accurate statement of law and provided the jury with proper guidance concerning a factual finding required for conviction. *See*

*Jones v. Commonwealth*, 272 Va. 692, 699 (2006); *Barrett v. Commonwealth*, 268 Va. 170, 183 (2004). The trial court was not required to accept an additional instruction simply because it was taken from the language of an opinion. Accordingly, we find no abuse of discretion in the trial court's decision to refuse Smith's proposed additional instruction on the term "willful."

B. *Sufficiency of the evidence*

1. *Standard of review*

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)).

2. *The evidence is sufficient to prove that Smith acted willfully.*

Smith argues that the trial court erred by convicting him of child abuse or neglect "because there was insufficient evidence to show that [Smith's] actions were willful." We disagree.

Code § 18.2-371.1(A) provides, in relevant part,

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony.

"To be willful, conduct 'must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose.'" *Jones*, 272 Va. at 699 (quoting *Commonwealth v. Duncan*, 267 Va. 377, 384 (2004)). "The terms 'bad purpose' or 'without justifiable excuse,' while facially unspecific, necessarily

- 11 -

imply knowledge that particular conduct will likely result in injury or illegality." *Ellis v. Commonwealth*, 29 Va. App. 548, 554 (1999). Code § 18.2-371.1 "proscribes advertence, not inadvertence." *Mangano v. Commonwealth*, 44 Va. App. 210, 216 (2004). "The analysis regarding whether an act is willful is fact specific." *Miller v. Commonwealth*, 64 Va. App. 527, 544 (2015).

Virginia courts have reversed convictions for felony child abuse in situations where the defendants could not reasonably have anticipated the danger faced by the children. *See, e.g.*, *Morris v. Commonwealth*, 272 Va. 732, 740 (2006) (defendant double-locked the door to her trailer before she and her two young children went to sleep, but the children awoke and went outside to play unsupervised); *Ellis*, 29 Va. App. at 555-56 (defendant left her children alone in their apartment where she had inadvertently left a stove burner on, eventually igniting a fire); *Mangano*, 44 Va. App. at 215 (defendant saw his fourteen-year-old son holding a rifle and told him to put the gun away, but left the room before his son accidentally shot another child; the defendant had no reason to believe the gun was loaded or that his son would disobey him); *White*, 68 Va. App. at 123-24 (defendant's young son went outside and fell into the septic tank in their backyard while the defendant slept).

Yet, Virginia courts have affirmed convictions for child abuse or neglect where the facts and circumstances showed that the defendant knew of the danger his or her conduct posed to the child. *See Barrett*, 268 Va. at 184. In *Barrett*, the Supreme Court affirmed a conviction for child neglect where the defendant fell asleep after a night of drinking while her two young children were in her sole care. *Id.* at 180. While she slept, the elder child drowned the younger child in the bathtub. *Id.* The Supreme Court affirmed the defendant's convictions because the defendant knew the older child acted aggressively toward the younger child, and the elder child had previously pulled the younger child into the bathtub and submerged him in water. *Id.* at 181-82.

- 12 -

The Court stressed the defendant knew of the older child's propensity to injure the younger child yet recklessly ignored those warning symptoms. *Id.* at 184. She "created a situation 'reasonably calculated to produce injury, or which [made] it not improbable that injury [would] be occasioned . . . .'" *Id.* (alterations in original) (quoting *Cable v. Commonwealth*, 243 Va. 236, 240 (1992)).

Here, the evidence was sufficient to prove that Smith, like the defendant in *Barrett*, knew that L.C., his younger child, was at risk of harm from Robbie, the elder child, and despite this risk, he repeatedly entrusted L.C. to Robbie's care. Contrary to Smith's claims that he did not know Robbie was a danger to L.C., the evidence demonstrates otherwise. Smith's cell phone contained photos, taken in August 2018, of bruises on L.C.'s body, demonstrating that Smith knew L.C. was being harmed. Smith also admitted to police that L.C. told Smith that Robbie was hurting him, but Smith did nothing but warn Robbie to stop disciplining L.C., which Smith admitted was ineffective. He also knew that Robbie was jealous of L.C. and that L.C. did not want to go places in Robbie's company. Smith was also informed that someone had made a complaint that L.C. was being abused by Robbie and Seals.

Beyond that, Smith was aware that L.C. had come to harm while in Robbie's care on other occasions. Smith and Seals left L.C. and T.C. with Robbie on September 23, 2018, while they went grocery shopping. When they returned, both boys had strangulation injuries that required emergency medical treatment at the hospital. Though Smith told the hospital that L.C. and T.C. strangled each other, a nurse at the hospital was concerned that the children were being abused. Smith admitted to police that "the hospital said that the kid is being abused." Robbie later indicated that Smith knew Robbie was responsible for the injuries. Additionally, Smith and Seals concocted a false narrative about how the injuries occurred to protect themselves and

- 13 -

Robbie from a potential CPS investigation. Smith claimed that after this incident, he and Seals "stopped going places together."

Despite this incident, Smith left L.C. in Robbie's care on November 9, 2018. When Smith returned, he found L.C. in severe pain, defecating, and vomiting blood. L.C. was vomiting so frequently, they had to change the trash bags multiple times, and they ended up putting him "in the tub, because he kept puking." While L.C. was in the tub, Smith noticed bruises on L.C. that Seals could not explain. Smith and Seals did not take L.C. to the hospital, deciding to wait and see if he improved. According to Smith, L.C. showed signs of improvement, so they did not take L.C. to the hospital.

On November 12, 2018, Smith and Seals again left L.C. in Robbie's care, during which time he inflicted the fatal blows, exacerbating the previous injuries and causing L.C.'s death. L.C. had no ability to call for help or protect himself. Just as in *Barrett*, Smith knew of Robbie's propensity to injure L.C. and recklessly ignored the prior situations "in neglect of h[is] duty to protect" L.C. *Barrett*, 268 Va. at 184. Even assuming for a moment that Smith did not know that Robbie was the direct cause of L.C.'s injuries, he was, at minimum, aware that L.C. had been seriously harmed while in Robbie's care on multiple occasions, and he continued to leave L.C. in Robbie's care. A reasonable factfinder could conclude beyond a reasonable doubt that Smith's conscious decision to leave L.C. with Robbie while unsupervised created a situation likely to cause L.C. serious injury and even the death that ultimately resulted. Thus, we find the evidence was sufficient to find that Smith's actions were willful.[5]

---

[5] In his fifth assignment of error, Smith also argues that the trial court erred when it convicted him of child endangerment because he was not criminally negligent in failing to recognize the danger Robbie posed to L.C. But Code § 40.1-103(A) provides that is unlawful for anyone "having the custody of any child *willfully* or negligently to cause or permit the life of such child to be endangered or the health of such child to be injured." (Emphasis added.) Because we have already determined that Smith's actions were willful, the evidence is sufficient

3. *Assuming Smith's causation argument is preserved, the evidence is sufficient to show that his actions "caused or permitted" L.C.'s death.*

Smith's next assignment of error contends that the evidence was insufficient to show that Smith "caused or permitted" L.C.'s death. His argument on brief contends that Smith was not the proximate cause of L.C.'s death. He argues that Robbie's actions were an intervening act that broke the chain of causal connection. Smith's arguments in the trial court, however, focused only on the "causes and permits" language in Code § 18.2-371.1. Arguably, these are different arguments, which would render Smith's assignment of error not preserved under Rule 5A:18. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."); *see also Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc) ("Making one specific argument on an issue does not preserve a separate legal point on the same issue for review.").

Though the legal terminology used is not the same, the gist of Smith's argument here and below is the same—Smith did not cause L.C.'s death, Robbie did. But assuming without deciding that this issue is properly preserved, the evidence is sufficient to sustain Smith's conviction under Code § 18.2-371.1. Code § 18.2-371.1 requires the Commonwealth to prove that Smith's actions "cause[d] or permit[ed] serious injury to the life or health of" L.C. The record demonstrates that Smith continued to leave L.C. in Robbie's care, despite knowledge of multiple incidents during which L.C. was harmed in Robbie's care, enabling his death at Robbie's hands. Thus, the evidence is sufficient to demonstrate that Smith "permitted" the serious injuries sustained by and the ultimate death of L.C.

---

to sustain Smith's conviction for child endangerment. We do not need to address whether his actions were also criminally negligent.

C. *Smith's argument that the evidence was insufficient to convict him of felony homicide is not preserved.*

Smith argues that the evidence was insufficient to prove his guilt of "felony homicide because there was insufficient evidence that [L.C.'s] death was caused by some felonious act done by" Smith.

Rule 5A:18 provides, "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." On appeal, Smith contends that the evidence was insufficient because the Commonwealth did not prove that he committed the underlying felony with malice. Before the trial court, however, he argued that the Commonwealth had to prove that he was "in the commission of . . . child neglect, and it has to have a causal connection with the death." It is well-established that "[m]aking one specific argument on an issue does not preserve a separate legal point on the same issue for review." *Edwards*, 41 Va. App. at 760. Thus, this issue is not preserved.[6]

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment, but remand the matter to the trial court for correction of a clerical error.

*Affirmed and remanded.*

---

[6] Additionally, the jury instruction, to which Smith agreed, did not require a finding of malice to sustain Smith's conviction for felony homicide or child abuse or neglect causing or permitting serious injury. As the Virginia Supreme Court has stated, jury "instructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review." *Smith v. Commonwealth*, 296 Va. 450, 461 (2018) (quoting *Wintergreen Partners, Inc. v. McGuireWoods, LLP*, 280 Va. 374, 379 (2010)). By failing to object to the jury instructions or requesting an instruction including malice as an element of the offenses, Smith waived any argument concerning proof of malice.