UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Callins and Frucci
Argued at Lexington, Virginia


MICHAEL SHIK PARK

MEMORANDUM OPINION[*] BY
v.        Record No. 0813-24-3        JUDGE DOMINIQUE A. CALLINS
SEPTEMBER 30, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF RUSSELL COUNTY
Michael L. Moore, Judge

Alan J. Cilman for appellant.

Sabina B. Thaler, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, Michael Shik Park was convicted of one count of child abuse and

neglect and one count of reckless endangerment of a child under Code § 18.2-371.1(A) and (B).

On appeal, he argues that the trial court erred in (1) failing to grant his motion for a bill of

particulars; (2) failing to dismiss his charges on the grounds of double jeopardy and autrefois

convict; (3) failing to dismiss his charges on the grounds of ineffective assistance of counsel;

(4) failing to give his proposed jury instruction defining the meaning of "willful"; (5) failing to

set aside the verdict on the grounds that the evidence was insufficient to support the verdict; and

(6) imposing a sentence exceeding the sentencing guidelines.  For the following reasons, we

affirm the trial court's judgment.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

Park's biological son, K.P.,[2] was born in 2006 with the rare genetic condition 49XXXXY Syndrome, causing him to have three extra X chromosomes compared to a normal male. Children born with this condition suffer mild to moderate intellectual disability, along with subtle physical differences in their facial features and other parts of their body. Those suffering from this condition are typically not able to live independently and usually live with either an adult family member or in an assisted group living situation. Park was K.P.'s primary caregiver throughout K.P.'s life, and K.P. had no contact with his biological mother.

In 2019, Park and K.P. moved from Northern Virginia to a farm in Russell County, where Park's girlfriend, Rebecca Bremner, also lived. Park neither enrolled K.P., who was still a minor, in school nor homeschooled K.P. while they lived in Russell County. Bremner ran a dog-breeding business out of their house. Because K.P. was allergic to dogs, Park moved K.P. into a box trailer 120 feet away from the home, where K.P. lived for approximately three years. The box trailer had wooden walls and an aluminum roof. It was about 21 feet long and 8.5 feet wide. The interior of the box trailer contained chairs, a twin bed, and a small heater powered by extension cords, but it had no windows, no running water, no built-in electricity, no kitchen or interior toilet, and no insulation.

---

[1] "On appeal, we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Yerling v. Commonwealth*, 71 Va. App. 527, 530 (2020) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 236 (2016)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

[2] We use initials to protect the privacy of the victim. *See Poole v. Commonwealth*, 73 Va. App. 357, 360 n.1 (2021).

Between December 2022 and early January 2023, Russell County experienced four extended periods of cold weather. During these periods, the temperature fell below freezing for at least 40 hours. Between December 23 and 27, the temperature fell below freezing for over 100 hours and fell below zero for 11 hours. Park and Bremner kept K.P., who was 16 years old at the time, residing in the box trailer during these periods of extreme cold.

Park left K.P. alone in Bremner's care from about December 16 to January 3 to attend his brother's out-of-state funeral; however, Bremner regularly texted Park about the weather conditions in Russell County. On December 16, Bremner texted Park that "[m]y toes, fingers and face are cold af." On December 18, Bremner texted Park that "[m]y hands are freezing. It's only 21 degrees here." On December 21, Bremner sent Park a picture of a shirtless K.P. appearing to be shivering in an outdoor hot tub that they used to bathe K.P. On December 24, Bremner texted Park that the temperature was "-20" and that "[t]he waters frozen." On December 31, Bremner texted Park that "I think we need to put [K.P.] back in diapers. He's not using the toilet. He just pees and poops on the mattress," to which Park responded, "Gross" and "Ok."

On January 10, after Park had returned to Russell County and was caring for K.P. by himself, he texted Bremner that "[K.P.] told me u beat him an[d] flip[p]ed him. And now he can[']t move lol. Lazy bitch." Later that day, Park texted Bremner "Omg," followed by several messages asking her to call him "asap." At 4:09 p.m., Park sent Bremner a picture of K.P.'s foot, which showed that K.P.'s big toe had turned black, with the blackness spreading throughout his foot and toward his ankle. Park later deleted the message containing the picture of K.P.'s blackened foot. As the day went on, Park texted Bremner that he was "shaking," was at his "lowest ever," and could not "function like a human being."

At 2:31 a.m. on January 11, Park texted Bremner that he could not sleep because "[K.P.] is in a lot of pain." Park then texted Bremner that "I need [B]enadryl to put [K.P.] out." At 2:45 a.m., Park texted Bremner that he had administered "allergy meds" to K.P. and that K.P. had "finally fell asleep." At around 9:00 a.m. on January 11, Park texted Bremner that he was "concerned about" K.P. Bremner responded that K.P. "really needs antibiotics" and "probably children's Tylenol," to which Park responded, "I[']m not gonna get it til u come back." At 10:30 a.m., Park texted Bremner that "[K.P.] is screaming in pain." Around ten hours later, at approximately 8:00 p.m., Park brought K.P. to Johnston Memorial Hospital.

K.P. was screaming and crying as he was brought into the emergency room ("ER"), and he smelled of urine and feces. An ER nurse observed that K.P.'s feet "were black all the way up to past his ankles" and that his condition was "unlike anything I had seen in any patient." K.P.'s treating doctors determined that, due to experiencing extensive frostbite, K.P. had developed significant gangrene in both of his feet, meaning that the tissue in his feet was necrotic. K.P.'s doctors determined that the gangrenous condition of K.P.'s feet would have taken weeks to develop. K.P. also suffered a sacral pressure sore—or, "bed sore"—on his lower back, an injury typically observed in people who lie in one position on their back for an extended period of time. The doctors further diagnosed K.P. with nutritional dermatosis, a type of skin rash caused by a nutritionally deficient diet that takes weeks to develop. Due to the extent of K.P.'s injuries, he was transferred to Wake Forest Hospital in North Carolina the same day he presented to the ER. A vascular surgery team determined that K.P.'s feet were unsalvageable and that he needed bilateral amputations below his knees to survive. K.P. underwent bilateral guillotine amputations, causing him to lose both feet.

Park gave various explanations to the medical professionals treating K.P. regarding K.P.'s medical history. Park told the ER nurse that "he had noticed that [K.P.'s] feet looked

unusual" and that "a few days had passed and [K.P.'s feet] weren't getting better. So, he decided to bring him in to be checked out." He told K.P.'s ER doctor that "there might have been a brief cold exposure some days leading up to presentation." Park told K.P.'s pediatric surgeon that K.P. was walking normally until three days ago, when he stopped walking. He explained that the night before he brought K.P. to the ER, he "took [K.P.'s] socks and shoes off to look at his feet, saw that they were black, and then took him to the hospital." Park told the pediatric surgeon's team that there was no history of cold exposure that could explain the necrosis of K.P.'s feet. He told K.P.'s vascular surgeon that K.P. may have "urinated on his feet." To explain the bed sore on K.P.'s back, Park told K.P.'s dermatologist that K.P. had a history of eczema and that "this rash had come up very recently, like in the past two to three days." Park also said that K.P. ate "a well-balanced diet with fresh fruits and vegetables." Park told K.P.'s pediatrician that K.P had begun "complaining of possible arm pain, and then, [Park] checked his arms and didn't see anything." He said that K.P. "had been acting strangely and had a temper tantrum, which was unusual for him, and then the morning of the 11th, did not want to get out of bed." Park explained that when he initially discovered the problem, he noticed K.P.'s legs were swollen "[a]nd that [K.P.'s] feet were wet and cold in his socks and he was not sure how long the socks had been on." Park also said that K.P. "lived in an apartment."

On January 12, 2023, Park texted Bremner that the Department of Social Services ("DSS") called him, and he directed Bremner to "[c]lean the trailer up for me." On January 17, police officers interviewed Park in K.P.'s hospital room at Wake Forest regarding K.P.'s history and living conditions. The next day, Park texted Bremner that the "[c]ops are coming to see [K.P.'s] room," and he later deleted the message. Park then texted and deleted messages asking Bremner to remove his guns, to "[t]ry to put clothes in [the trailer] to look like [K.P.'s] clothes [are] there," and to "put a small table and maybe put the tv in there." Bremner texted Park that

they "could just pack it up for nova," and Park responded, "Ok make it look like u already packed stuff up for us to go." Bremner asked Park if she should "say it's packed up," and Park responded, "No ur gonna have to pro[]ve it," "[it's] the pigs." Park then texted Bremner that the police are "gonna have a warrant" and were "coming to prosecute." Park asked Bremner if she emptied the hot tub, and she answered, "Yes." Park then texted and deleted messages instructing Bremner to "[u]se garage clothes," to "[j]ust try to make the trailer like an apt," and to "put an ipod in there." Park finally texted and deleted a message asking Bremner if he could "see via video" Bremner's progress.

On January 18, 2023, police obtained an arrest warrant charging Park with child abuse and neglect under Code § 18.2-371.1. DSS also instituted an investigation against Park and, on April 6, 2023, made a finding of Level 1 physical abuse and registered Park's name in the DSS Child Abuse and Neglect Registry for eighteen years. On August 14, 2023, a grand jury indicted Park on one count of child abuse and neglect under Code § 18.2-371.1(A) and one count of reckless endangerment of a child under Code § 18.2-371.1(B). Both counts stated that Park committed these offenses "on or between December 1, 2022, and January 11, 2023."

Before trial, Park filed three motions that are at issue in this appeal. First, he moved for a bill of particulars, asking the trial court to direct the Commonwealth to specify the exact time, location, and specific violative acts that Park committed for each of the dates between December 1, 2022, and January 11, 2023. The Commonwealth asserted that it was not capable of providing this information. The trial court then denied the motion, stating, "this is not a case where the Commonwealth has charged separate offenses for every day. This is a range case, to the benefit of the defendants . . . . I can't see how [a] bill of particulars is going to help when they can't answer the question." Second, Park moved to dismiss his charges on grounds of double jeopardy and autrefois convict, asserting that DSS's placement of his name in the Child Abuse and

Neglect Registry was a "punishment" and that any subsequent punishment for his criminal charges would violate double jeopardy. The trial court denied the motion, concluding that DSS's placement of Park's name in the registry was not a punitive punishment akin to a criminal punishment. Finally, Park moved to dismiss his charges based on ineffective assistance of counsel, although he never obtained a ruling from the trial court on his motion and did not raise the issue again for the rest of the trial court proceedings.

During Park's five-day jury trial, Dr. Sarah Northrop, the pediatrician who treated K.P. at Wake Forest Hospital, was admitted as an expert in the field of child abuse pediatrics. Dr. Northrop concluded that K.P.'s frostbite was "consistent with physical neglect, medical neglect and supervisional neglect." Dr. Northrop opined that K.P.'s frostbite "was a process that happened over time and would've been obvious to a caretaker. So not seeking care for those injuries and . . . those findings within a reasonable amount of time would be consistent with medical neglect." Dr. Northrop opined that K.P.'s bed sore resulted from physical neglect because "a sixteen (16) year old child with developmental disabilities [should] be mobile and not be laying in bed for a prolonged period of time." Dr. Northrop opined that K.P.'s living situation in the box trailer constituted neglect due to the lack of insulation, lack of running water or a toilet, and the significant distance between the box trailer and the house. Dr. Northrop opined that the box trailer would not be an adequate shelter for a developmentally disabled child like K.P, who required heightened supervision due to his condition. In Dr. Northrop's opinion, K.P.'s permanent disfigurement as a result of his living conditions met the "medical definition" of "torture," and Park should have immediately sought treatment for K.P.'s injuries.[3]

_____

[3] Dr. Northrop defined the medical definition of torture as "more than one process or a longitudinal process of neglect resulting in disfigurement or death."

At the conclusion of all the evidence at trial, Park offered a jury instruction defining the term "willful" based on language from *White v. Commonwealth*, 68 Va. App. 111 (2017). The trial court denied the instruction and instead granted the Commonwealth's proposed instruction based on the Virginia Model Jury Instruction for the term "willful act." The jury ultimately returned a verdict finding Park guilty of child abuse and neglect, and reckless endangerment of a child.

At Park's sentencing hearing, he moved to set aside the verdict on the grounds that the evidence failed to establish that his actions were "willful." The trial court denied the motion. After considering all the circumstances of the case, the trial court deviated from the sentencing guidelines recommendation of 11 months to 2 years and 7 months of imprisonment and instead imposed a 15-year sentence with 4 years suspended, for a total of 11 years of imprisonment. Park now appeals.

ANALYSIS

I. Bill of Particulars

Park argues that the trial court erred in denying his motion for a bill of particulars. Park asserts that his grand jury indictment was insufficient to inform him of the nature of his charges because the indictment stated a date range for when he violated Code § 18.2-371.1(A) and (B) and did not provide specifics as to what he did or did not do on each day between December 1, 2022, and January 11, 2023, to violate the statute. Park contends that the trial court's denial of his motion for a bill of particulars "allowed the Commonwealth to play fast and loose with its theory of the case."

A "trial court's decision whether to require the Commonwealth to file a bill of particulars is a matter that rests within its sound discretion." *Swisher v. Commonwealth*, 256 Va. 471, 480 (1998). "A defendant is not entitled to a bill of particulars as a matter of right." *Id.* "Rather,

- 8 -

Code § 19.2-230 states that a trial court 'may direct the filing of a bill of particulars.'" *Id.* "The purpose of a bill of particulars is to state sufficient facts regarding the crime to inform an accused in advance of the offense for which he is to be tried. He is entitled to no more." *Id.* (quoting *Hevener v. Commonwealth*, 189 Va. 802, 814 (1949)). "As long as an indictment sufficiently recites the elements of the offense, the Commonwealth is not required to include all evidence upon which it plans to rely to prove a particular offense." *Sims v. Commonwealth*, 28 Va. App. 611, 619-20 (1998). "[A]n accused should not be permitted to use a bill of particulars to expand the scope of discovery in a criminal case." *Id.* at 620.

Count one of Park's grand jury indictment stated:

> That, on or between December 1, 2022, and January 11, 2023, [Michael Shik Park] did unlawfully and feloniously, while being the parent, guardian, or other person responsible for the care of K.P., a child under the age of eighteen (18) years of age, engage in a willful act or omission or refuse to provide any necessary care for the child, which caused or permitted serious injury to occur to the life or health of such a child. In violation of § 18.2-371.1A [sic] of the Code of Virginia (1950) as amended.

Count two of Park's grand jury indictment stated:

> That, on or between December 1, 2022, and January 11, 2023, [Michael Shik Park] did unlawfully and feloniously, while being the parent, guardian, or other person responsible for the care of a child under the age of eighteen (18), engage in a willful act or omission in the care of such child which was so gross, wanton, and culpable as to show a reckless disregard for human life. In violation of § 18.2-371.1(B) of the Code of Virginia (1950) as amended.

We hold that the trial court did not abuse its discretion in denying Park's motion for a bill of particulars because his indictments stated sufficient facts informing him of all the elements of his charges under Code § 18.2-371.1(A) and (B). Thus, Park was not entitled to any further information from the Commonwealth as a matter of right. *See Swisher*, 256 Va. at 480; *Sims*, 28 Va. App. at 619-20. This is especially true where, as here, the trial court found that the

- 9 -

Commonwealth was not capable of providing Park with the information that he sought. It is of no moment that the Commonwealth could not specify the exact dates that Park violated Code § 18.2-371.1(A) and (B), as time is not an element of these offenses. *See Clinebell v. Commonwealth*, 3 Va. App. 362, 367 (1986) (holding that "[t]he allegation of time [in an indictment] . . . is not of such constitutional import because time was not of the essence of the offense charged"), *aff'd in part, rev'd in part on other grounds*, 235 Va. 319 (1988). Park was also not entitled to use his motion for a bill of particulars to expand the scope of discovery, *see Sims*, 28 Va. App. at 620, nor was he entitled to use his motion as a method to "require the Commonwealth to pick and choose among [her] proofs, to elect which to present and which to forego," *Pittman v. Commonwealth*, 17 Va. App. 33, 35 (1993).

## II. Double Jeopardy

Park argues that the trial court erred in denying his motion to dismiss his charges on the grounds of double jeopardy and autrefois convict. Park asserts that he unconstitutionally suffered multiple punishments because, after his criminal charges were filed against him, DSS instituted an investigation against him, made a finding of Level 1 physical abuse, and registered his name in the DSS Child Abuse and Neglect Registry for a period of eighteen years.

"The Fifth Amendment to the Constitution of the United States declares that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Severance v. Commonwealth*, 295 Va. 564, 571-72 (2018) (quoting U.S. Const. amend. V). "The constitutional prohibition against double jeopardy 'had its origin in the three common-law pleas of *autrefois acquit, autrefois convict*, and pardon.'" *Holley v. Commonwealth*, 64 Va. App. 156, 159 (2014) (quoting *United States v. Scott*, 437 U.S. 82, 87 (1978)). "Virginia's constitutional guarantee against double jeopardy affords a defendant the same guarantees as the federal Double Jeopardy Clause." *Severance*, 295 Va. at 572 n.8 (quoting *Stephens v. Commonwealth*, 263 Va.

- 10 -

58, 62 (2002)).  The constitutional prohibition against double jeopardy includes protection from "multiple punishments for the same offense."  *Commonwealth v. Hudgins*, 269 Va. 602, 605 (2005).  "However, the constitutional prohibition against double jeopardy 'protects only against multiple *criminal* punishments for the same offense . . . in successive proceedings.'"  *Depsky v. Commonwealth*, 50 Va. App. 454, 460 (2007) (alteration in original) (quoting *Dorsey v. Commonwealth*, 32 Va. App. 154, 161 (2000)).  "Accordingly, the imposition of a sanction that is civil, rather than criminal, in nature does not implicate double jeopardy principles."  *Id.*

"We review de novo whether 'multiple [criminal] punishments have been imposed for the same offense in violation of the double jeopardy clause.'"  *Commonwealth v. Gregg*, 295 Va. 293, 296 (2018) (quoting *Johnson v. Commonwealth*, 292 Va. 738, 741 (2016)).  In determining whether a civil sanction constitutes a criminal punishment, we consider factors such as

> (1) "whether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of *scienter*"; (4) "whether its operation will promote the traditional aims of punishment—retribution or deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

*Depsky*, 50 Va. App. at 461 (quoting *Hudson v. United States*, 522 U.S. 93, 99-100 (1997)).  "[T]hese factors must be considered in relation to the statute on its face, and only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."  *Dorsey*, 32 Va. App. at 162 (quoting *Hudson*, 522 U.S. at 100).

We hold that DSS's registering of Park's name in the Child Abuse and Neglect Registry does not constitute a criminal punishment, and thus Park's subsequent criminal convictions under Code § 18.2-371.1(A) and (B) do not violate double jeopardy.  First, the process of determining whether a complaint of abuse or neglect is "founded" is an administrative finding by

- 11 -

DSS based on a preponderance of the evidence standard and does not bear the hallmarks of a criminal proceeding. Second, it is evident that placing a founded abuser's name in the registry is intended to serve a remedial purpose to protect children and the public, and not a punitive purpose against the abuser. *See* Code § 63.2-1515 (listing circumstances in which DSS shall disclose information in the registry to various Virginia employers and agencies). Finally, there is no indication that the registry's function is to impose retribution or deterrence on a founded abuser, and placing an abuser's name in the registry does not result in criminal penalties such as incarceration, community service, probation, or fines. Rather, the registry is intended to fulfill a protective and regulatory purpose, not to punish individuals in a criminal sense. *Cf. Kitze v. Commonwealth*, 23 Va. App. 213, 216-17 (1996) (holding that registration in the Virginia Sex Offender Registry "is *not* penal" and that "[p]rotecting the public and preventing crimes are regulatory, not punitive, purposes").

The specific factors we consider here, on the whole, sufficiently persuade us that Park's civil sanction does not constitute a criminal punishment under *Depsky*. Accordingly, the trial court did not err in denying Park's motion to dismiss based on double jeopardy and autrefois convict.

### III. Ineffective Assistance of Counsel

Park argues that the trial court erred in failing to dismiss his charges on the grounds that the actions of the Commonwealth and its agents resulted in ineffective assistance of counsel. Specifically, Park asserts that he was denied the opportunity to have private video conversations and phone calls with his counsel while in jail and that the Commonwealth reviewed portions of phone calls between him and his counsel that were subject to attorney-client privilege.

We will not consider Park's assignment of error because claims of ineffective assistance of counsel are not cognizable on direct appeal and must be raised in a habeas corpus proceeding.

*See Sigmon v. Dir. of the Dep't of Corr.*, 285 Va. 526, 533 (2013) ("[C]laims of ineffective assistance of counsel are not reviewable on direct appeal and thus can be raised only in a habeas corpus proceeding.").

## IV. Jury Instruction

After the close of all the evidence at trial, Park offered the following jury instruction defining the word "willful":

> The word willful often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal case it means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely. The word is also employed to characterize a thing done without ground for believing it is lawful.
>
> The term willful is stronger than voluntary or intentional; it is the equivalent of malicious, evil or corrupt. Willful act imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury. The terms "bad purpose" or "without justifiable excuse" necessarily imply knowledge that particular conduct will likely result in injury or illegality.

The language of Park's proposed instruction was quoted nearly verbatim from language used by this Court to define "willful" in *White v. Commonwealth*, 68 Va. App. 111 (2017). The trial court denied the instruction, finding that its use of the words "stubbornly," "obstinately," "perversely," "malicious," "evil," and "corrupt" could be confusing to the jury and were not clearly defined. The trial court instead granted the Commonwealth's proposed jury instruction on "willful act" based on Criminal Model Instruction No. 29.360, which states:

> A willful act is one done with a bad purpose, or without justifiable excuse, or without ground for believing it is lawful. A willful act is intentional, or knowing, or voluntary, as distinguished from accidental. The terms "bad purpose" or "without justifiable excuse" require knowledge that the particular conduct will likely result in injury or illegality.

- 13 -

Park argues that the trial court erred in denying his proposed jury instruction, asserting that his instruction based on *White* contains a more accurate and stringent standard for willfulness than the model jury instruction.

"Whether to give or deny jury instructions 'rest[s] in the sound discretion of the trial court.'" *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017) (alteration in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "Our responsibility in reviewing instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Id.* (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 228 (2013)). "The burden is on the proponent of a jury instruction to satisfy the trial court that the proposed language is a correct statement of the law, applicable to the facts of the case on trial, and expressed in appropriate language." *Shaikh v. Johnson*, 276 Va. 537, 546 (2008). "[N]o instruction should be given . . . 'which would be confusing or misleading to the jury.'" *Graves v. Commonwealth*, 65 Va. App. 702, 708 (2016) (second alteration in original) (quoting *Mouberry v. Commonwealth*, 39 Va. App. 576, 582 (2003)). "[A] court may exercise discretion and properly exclude an instruction that both correctly states the law and is supported by the evidence when other granted instructions fully and fairly cover the relevant principle of law." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne*, 292 Va. at 869).

We hold that the trial court did not abuse its discretion in refusing Park's proposed jury instruction on the term "willful" because the Commonwealth's instruction on "willful act" based on the Virginia Model Jury Instruction was a correct statement of law and fully and fairly covered the relevant principles of law. *See Barrett v. Commonwealth*, 32 Va. App. 693, 699

(2000) ("'Willful' [as used in Code § 18.2-371.1] generally means an act done with a bad purpose, without justifiable excuse, or without ground for believing it is lawful. The term denotes 'an act which is intentional, or knowing, or voluntary, as distinguished from accidental.' The terms 'bad purpose' or 'without justifiable excuse[]' . . . necessarily imply knowledge that particular conduct will likely result in injury or illegality." (first alteration in original) (quoting *Ellis v. Commonwealth*, 29 Va. App. 548, 554 (1999))), *aff'd*, 268 Va. 170 (2004). The trial court also exercised reasonable discretion in denying Park's proposed instruction on the grounds that it contained extraneous and undefined verbiage drawn from *White*. *See Shaikh*, 276 Va. at 546 ("We have frequently cautioned against 'the danger of the indiscriminate use of language from appellate opinions in a jury instruction.'" (quoting *Clohessy v. Weiler*, 250 Va. 249, 255 (1995))).

## V. Motion to Set Aside the Verdict

Park argues that the trial court erred in denying his post-trial motion to aside the verdict, asserting that the evidence failed to establish, inter alia, that he willfully violated Code § 18.2-371.1(A) and (B). Our review of the sufficiency of the evidence is limited solely to the element of willfulness, as this is the only specific argument Park made to the trial court during his motion to set aside the verdict. Park's other arguments as to the sufficiency of the evidence are waived under Rule 5A:18.[4] *See Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) ("[An objection] must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." (quoting *Dickerson v. Commonwealth*, 58

---

[4] Park also argues on brief that (1) the evidence failed to establish that K.P.'s living in the box trailer (a) caused the frostbite or resulted in the amputations, or (b) was "so gross, wanton, and culpable as to show a reckless disregard for human life," and (2) the evidence failed to establish that the one day between Park seeing K.P.'s feet and going to the hospital (a) caused the frostbite or resulted in the amputations, or (b) was "so gross, wanton, and culpable as to show a reckless disregard for human life."

Va. App. 351, 356 (2011))); *Johnson v. Commonwealth*, 58 Va. App. 625, 637 (2011) ("Making

one specific argument on an issue does not preserve a separate legal point on the same issue for

review." (quoting *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc))).  Park

does not invoke the good-cause or ends-of-justice exceptions to Rule 5A:18, and we will not

invoke them sua sponte.  *See Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010).

As to the requisite element of willfulness for committing child abuse and neglect and

reckless endangerment of a child, Code § 18.2-371.1(A) states:

> Any parent, guardian, or other person responsible for the care of a
> child under the age of 18 who by *willful act or willful omission or
> refusal to provide any necessary care for the child's health* causes
> or permits serious injury to the life or health of such child is guilty
> of a Class 4 felony.

(Emphasis added).  Code § 18.2-371.1(B)(1) states:

> Any parent, guardian, or other person responsible for the care of a
> child under the age of 18 whose *willful act or omission* in the care
> of such child was so gross, wanton, and culpable as to show a
> reckless disregard for human life is guilty of a Class 6 felony.

(Emphasis added).  As explained in Section IV, *supra*, the trial court properly instructed the jury

on the definition of a "willful act" as that term is used in Code § 18.2-371.1:

> A willful act is one done with a bad purpose, or without justifiable
> excuse, or without ground for believing it is lawful.  A willful act
> is intentional, or knowing, or voluntary, as distinguished from
> accidental.  The terms "bad purpose" or "without justifiable
> excuse" require knowledge that the particular conduct will likely
> result in injury or illegality.

In reviewing a challenge to the sufficiency of the evidence to support a conviction, "we

will affirm the judgment of the trial court unless that judgment is 'plainly wrong or without

evidence to support it.'"  *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Kelly

v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)).  "[T]he relevant question is whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting

*Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018)). "This familiar standard gives full play

to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the

evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting

*Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). "[C]ircumstantial evidence is

competent and is entitled to as much weight as direct evidence provided that the circumstantial

evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt."

*Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (alteration in original) (quoting *Dowden v.*

*Commonwealth*, 260 Va. 459, 468 (2000)). "While no single piece of evidence may be

sufficient, the combined force of many concurrent and related circumstances . . . may lead a

reasonable mind irresistibly to a conclusion." *Id.* at 512-13 (alteration in original) (quoting

*Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

Here, the evidence established that, between December 1, 2022, and January 11, 2023,

Park housed his 16-year-old developmentally disabled son, K.P., alone in an uninsulated box

trailer during freezing winter temperatures, and K.P. subsequently developed frostbite and

gangrene on his feet that was so severe that doctors had to amputate K.P.'s feet to save his life.

K.P. was malnourished to the point that he had developed nutritional dermatosis, and doctors

determined that K.P. also suffered from a bed sore consistent with lying in one position on his

back for an extended period of time. K.P.'s treating doctors determined that K.P.'s injuries

would have taken weeks to develop. Dr. Northrop, the child abuse pediatrician who examined

K.P., testified that K.P.'s condition was "consistent with physical neglect, medical neglect and

supervisional neglect" and met the "medical definition" of "torture." She opined that the

frostbite to K.P.'s feet "was a process that happened over time and would've been obvious to a

- 17 -

caretaker.  So not seeking care for those injuries and . . . those findings within a reasonable amount of time would be consistent with medical neglect."[5]

The evidence further established that Park was aware that K.P. could not move his body over 24 hours before Park chose to take him to the ER and that K.P. had stopped walking three days before he became immobile.  Instead of seeking medical treatment when K.P. demonstrated to Park that he was unable to move, Park referred to K.P. as a "[l]azy bitch."  Park knew that K.P. was in severe pain and was unable to sleep, but instead of immediately taking K.P. to the hospital, Park "put [K.P.] out" with Benadryl.  Ten hours before Park finally took K.P. to the ER, he told Bremner that he was purposefully waiting to acquire antibiotics for K.P. despite observing that K.P. was "screaming in pain."  While K.P. screamed in pain, Park failed to provide necessary medical care for K.P.'s health from approximately 2:30 a.m. to 8:00 p.m. on January 11, 2023.

Additionally, Park deleted several of his text messages regarding the incident, deleted a photo of K.P.'s blackened gangrenous foot that he sent to Bremner, and attempted to make the

---

[5] In this respect, this case is readily distinguishable from cases cited by Park such as *Ellis v. Commonwealth*, 29 Va. App. 548 (1999); *Morris v. Commonwealth*, 272 Va. 732 (2006); *Mangano v. Commonwealth*, 44 Va. App. 210 (2004); and *White v. Commonwealth*, 68 Va. App. 111 (2017).  Each of these cases, at their core, involved a momentary lapse in judgment by parents who had no forewarning that potential injury to their children could occur, resulting in the parents' convictions for child abuse being reversed on appeal.  *See Ellis*, 29 Va. App. at 555 (finding the evidence "fail[ed] to show that [Ellis] left the apartment knowing the [gas stove] burner was on and in *conscious* disregard of the likely ignition of a grease fire that would ultimately endanger the lives of her children"); *Morris*, 272 Va. at 740 (noting that Morris "had no reason to believe her children would be in any danger while she was asleep with them, particularly after she had double-locked the trailer door"); *Mangano*, 44 Va. App. at 215 (observing that Mangano "had no reason to suspect that the gun was loaded or that his son would not obey" his order to put the gun away); *White*, 68 Va. App. at 122-27 ("[T]here was no evidence from which the trial court could infer that White was aware, prior to her son's death, of the heightened danger posed by the unsecured [septic tank] lid.").  By contrast, this case involves several days and weeks of abusive and neglectful conduct by Park towards his special-needs son, under circumstances in which Park should have been aware that his actions were jeopardizing K.P.'s health.

box trailer where K.P. lived appear more habitable to the police—all of which could be construed as evidence of Park's knowledge of his own guilt. *See Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992) ("[I]t is today universally conceded that the fact of an accused's . . . concealment . . . and related conduct are admissible as evidence of consciousness of guilt, and thus of guilt itself." (first alteration in original) (quoting *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991))). Park also acted evasively and gave misleading answers in response to the various healthcare workers' attempts to obtain a complete medical history of K.P., further demonstrating Park's consciousness of guilt. *See Covil v. Commonwealth*, 268 Va. 692, 696 (2004) ("A false or evasive account is a circumstance, similar to flight from a crime scene, that a fact-finder may properly consider as evidence of guilty knowledge.").

Considering the totality of the evidence in this case, we hold that the evidence sufficiently established that Park willfully abused and neglected K.P. and willfully endangered K.P.'s life in a reckless manner. Specifically, pursuant to the trial court's jury instruction on "willful act," the evidence sufficiently established that Park acted intentionally, knowingly, or voluntarily and that he acted with a bad purpose, without justifiable excuse, or without ground for believing his conduct was lawful, entailing that he had knowledge that his conduct would likely result in injury to K.P. or illegality. Accordingly, the trial court did not err in denying Park's motion to set aside the verdict.

## VI. Sentencing

Park argues that the trial court abused its discretion in imposing a sentence exceeding the sentencing guidelines. The sentencing guidelines recommended a sentence of 11 months to 2 years and 7 months. The trial court instead imposed a total sentence of 15 years with 4 years suspended, for an active sentence of 11 years.

"[S]entencing guidelines 'are discretionary, rather than mandatory'" and "are not binding on the circuit court's determination of the appropriate sentence." *Woodard v. Commonwealth*, 287 Va. 276, 281-82 (2014) (quoting *West v. Dir., Dep't of Corr.*, 273 Va. 56, 65 (2007)). "Rather, they are a tool designed to assist the judge in fixing an appropriate punishment." *Hunt v. Commonwealth*, 25 Va. App. 395, 404 (1997). Sentencing decisions, "if within the lawful boundaries of applicable sentencing statutes and constitutional limitations—are vested in the sound discretion of trial judges, not appellate judges." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 563 (2016). "[W]hen a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Id.* at 564 (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)). "[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Id.* at 565 (quoting *Dorszynski v. United States*, 418 U.S. 424, 431 (1974)).

Here, the sentencing guidelines recommendation of 11 months to 2 years and 7 months of imprisonment was not binding on the trial court, which retained the ultimate discretion to impose a sentence that it thought was appropriate based on the particular facts and circumstances of this case. *See id.* at 563; *Woodard*, 287 Va. at 281-82. In deciding to impose a sentence exceeding the sentencing guidelines, the trial court considered the egregious nature of Park's actions toward his special-needs son, the permanent and life-changing disfigurement that Park caused to his son, and Park's apparent unwillingness to accept responsibility for his actions. Given the aggravated circumstances present in this case, we find the trial court's decision to deviate from the sentencing guidelines to be eminently reasonable. Further, the trial court's imposition of a 15-year total sentence was within the statutory range for Park's convictions for a Class 4 felony and Class 6 felony under Code § 18.2-371.1(A) and (B). *See* Code § 18.2-10(d), (f).

Accordingly, we hold that the trial court's sentencing decision did not constitute an abuse of discretion.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*